# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER CHOTAS, *Plaintiff*, v. AREA STORAGE AND TRANSFER, INC., DAVID F. DEMCHAK, II and LORI DEMCHAK, *Defendants*. | Civil Action No. <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Jennifer Chotas, files this Complaint pursuant to 31 U.S.C. § 3730 (h) for wrongful termination in retaliation for her efforts to stop the Defendants, Area Transfer and Storage, Inc., David F. Demchak, II and Lori Demchak from engaging in conduct intended to defraud the United States Postal Service in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), alleging as follows:

1

**PARTIES**

1. Plaintiff, Jennifer Chotas, is an individual and resident of the Commonwealth of Pennsylvania. She has a B.A. in Accounting, A.S. in Business Management, and fifteen years of work experience in business management with an emphasis in all aspects of accounting, including twelve years of work experience at mid to upper management levels. Plaintiff was employed by Defendants as the company's Accounting and Analysis Manager from July 11, 2011 until she was fired on August 24, 2012.

2. Defendant, Area Storage and Transfer, Inc. ("Area") is a Pennsylvania Corporation with its headquarters at 1246 South Cameron Street, Harrisburg, Pennsylvania. With approximately 400 employees, Area has operated Highway Contract Routes ("HCRs") for the United States Postal Service ("USPS") since 1989. In FY 2011, Area was Number 84 on the list of Top U.S. Postal Service Suppliers for the year, having moved up from Number 111 for FY 2010. Area's reported contract amount with the USPS for FY 2012 was $16,784,161.77.

3. Defendants, David F. Demchak, II and Lori Demchak are residents of the Commonwealth of Pennsylvania. The Demchaks are husband and wife and are Area's President and Vice-President, respectively.

2

4. Plaintiff is informed and believes, and based thereupon alleges, that at all times relevant hereto, each of the Defendants was the employer, agent, managing agent, supervisor, employee and/or co-conspirator of the other Defendants acting in concert and within the course and scope of said agency, employment or conspiracy to bring about the actions complained of herein and the retaliation against the Plaintiff in violation of the False Claims Act, 31 U.S.C. § 3730 (h).

**JURISDICTION AND VENUE**

5. The Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

6. The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States.

7. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found, reside or have transacted business in the Middle District of Pennsylvania.

8. This suit is not based upon the prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation or in a congressional, administrative, or Government Accounting Office report, hearing,

audit, or investigation, or from the news media.

9. To the extent that there has been a public disclosure unknown to the Plaintiff, the Plaintiff is the original source under 31 U.S.C. § 3730(e)(4). Plaintiff has direct and independent knowledge of the information on which the allegations are based and voluntarily provided the information to the Government before filing this action based on that information. *See* 31 U.S.C. § 3730(e)(4).

**ALLEGATIONS**

**Background**

10. Plaintiff, Jennifer Chotas, began her employment with Defendants on July 11, 2011. She was hired as the Accounting and Analysis Manager for the entire company, with the specific promise from Lori Demchak that she would be moved into the position of the Chief Financial Officer (CFO). She was employed at an initial annual salary of $52,000 but after a favorable 90 day review, her annual salary was increased to $57,000. She was also provided with the "Standard Area-provided benefits for salaried employees," including 401(k) retirement account, health, dental and vision insurance, profit sharing, and vacation and personal days.

11. As part of her job duties, Ms. Chotas was responsible for preparing Area's financial records, including accounting and ledger sheets, balance sheets, equipment inventory records, and banking records. She was also charged with the

duties of payroll auditing, human resources planning and management, accounting controls maintenance through preparing and recommending policies and procedures, and other duties directed by the Vice-President and the President.

12. From her first day of employment until August 24, 2012, Ms. Chotas received only positive reports and feedback about her work from her immediate supervisor, Lori Demchak.

**Area's Duties to the USPS**

13. The USPS contracts with private companies to provide various services, including highway transportation services, which consist of either transportation or delivery. Area was retained by the USPS to supply transportation services, which involved the physical transportation of mail from one location to another via long-haul tractor trailers.

14. In order to be granted a Highway Contract Route for the USPS, and to maintain that contract, Area was required to complete and submit a number of USPS Forms and Certifications, including the "Cost Worksheet" (PS Form 7468A), "Representations and Certifications" (PS Form 7319-C), and the information and documents referenced below.

15. The USPS evaluates its suppliers using four criteria: Supplier Eligibility; Financial Capability; Past Performance; and Supplier Capability. *See USPS Supplier*

5

*Prequalification for Highway Transportation Services, Solicitation Number: 5BSMTR-05-A-3004*. To determine "Financial Capability," the USPS requires the contractor to submit detailed financial information, copies of the last three months of bank statements, a letter from the bank stating that the contractor has an available credit line of at least 10% of the estimated contract amount, and credit reports from the three major credit bureaus. *Id.*

16. To determine "Supplier Capability," the USPS examines various pieces of information, including, most relevantly, "Equipment Capacity," which incorporates review of the "Company Fleet" Form (SMTP Form 5473-c). *Id.* The Cost Worksheet also contains a line item related to fleet numbers and types committed to the performance of the USPS contract.

17. Upon information and belief, Defendants completed and submitted all of these Forms and Certifications to the USPS to bid for the HCR Contract.

18. Because the USPS relies on the accuracy of the information contained therein, Defendants were under a duty to submit complete and true data regarding all aspects of Area's business, including "Financial Capability" and "Equipment Capacity."

19. Ms. Chotas soon discovered that the Demchak Defendants falsified information regarding Area's financial condition so as to present an inflated

representation of Area's capabilities. Ms. Chotas believes that the Demchak Defendants submitted this fraudulent information to the USPS in order to induce the USPS to renew the HCR contract with Area.

**Ms. Chotas Discovers Defendants' Fraud During the Performance of Her Duties**

20. Plaintiff's job duties for Area included the review of the company's financial records, maintenance of account ledgers, profit and loss statements, balance sheets, and preparation of financial statements.

21. During late February of 2012, Ms. Chotas was told by Lori Demchak that the "financials" and operational documents were due soon to the USPS in order to renew Area's contracts. Since this was the first time she was present for the submission of the "financials," Ms. Chotas relied on Lori Demchak to guide her as to what specific information was to be presented to the USPS. However, Ms. Chotas was suddenly required to take personal leave to care for her husband, who had become ill. Consequently, Ms. Chotas was away from her employment from Wednesday, February 29, 2012 through Friday, March 2, 2012.

22. Upon her return to the office on Monday, March 5, 2012, Ms. Chotas asked if her assistance was needed to prepare the financials to submit to the USPS for renewal of the contracts. Lori Demchak responded that she did not need her

assistance. Ms. Chotas, not knowing exactly when the financials were due to the USPS for Area's contract renewal, thought nothing further of the matter because Lori Demchak would guide her through the assignment when the appropriate time came.

23.     The following day, on March 6, 2012, Ms. Chotas was reconciling the company's PNC bank account statement for February 2012 when she discovered an adjustment to the contract revenue account that was made on March 1, 2012 at 2:00 p.m. This adjustment posted $725,000 of revenue and corresponding cash to the financial accounts effective December 31, 2011. This adjustment replaced a $225,000 cash deposit of revenue from Kemner Delivery Service on January 5, 2011. The effect of this adjustment was to increase revenue and cash by $500,000.

24.     During the course of that same bank reconciliation, Ms. Chotas saw that again on March 1, 2012 at 2:09 p.m., a $500,000 payment journal entry had been posted to the company's computerized account ledger in QuickBooks. The effect of this entry was to record the purchase of trucks costing $500,000 with a corresponding decrease in cash of $500,000, which was not reflected in the bank statement. This entry affected the financial accounts as of March 1, 2012. Upon further research, Ms. Chotas discovered a second payment journal entry for $500,000 again made on March 1, 2012 at 2:11 p.m., which overrode the first entry by making the financial accounts reflect the $500,000 disbursement for trucks effective December 31, 2011, instead of

March 1, 2012.

25.     On March 7, 2012, Ms. Chotas printed the journal entries that overstated revenue and fixed assets (specifically trucks) by $500,000 and questioned Ms. Demchak about them.  Ms. Demchak replied that she "was just trying something for up and coming postal contracts," to which Plaintiff responded that her actions were fraudulent.  Ms. Demchak then took the printout from Ms. Chotas and threw it into the trash.

26.     On March 8, 2012, Ms. Chotas, concerned about the discussion with Ms. Demchak about the $500,000 journal entries, conducted an audit trail of other accounts in QuickBooks and found entries affecting Fuel line items for 2009, 2010 and 2011.

27.     On March 9, 2012 Ms. Chotas questioned Lori Demchak about the additional entries.   Ms. Demchak responded again that she was "just trying something" and that she needed to make adjustments for the USPS contract renewals. When asked if she was planning to use the entries for the USPS renewal submissions, Lori Demchak did not offer Plaintiff an answer. Ms. Chotas informed Ms. Demchak that the entries were suspicious and should not have been posted, even if she was only "just trying something."

28.     Ms. Chotas took it upon herself to immediately correct the journal entries

by properly reducing revenue and fixed assets (specifically trucks) by $500,000 to ensure the financials were accurate. Ms. Chotas suggested to Lori Demchak to password protect the accounting system to stop any and all prior year back postings in the system. The Plaintiff again thought nothing else of the matter because at that time, she believed Ms. Demchak had merely been "playing around" as she had claimed. Moreover, Ms. Chotas felt comfortable that an appropriate procedure had been implemented and corrections had been made so that when the time came to submit the financials to the USPS, they would be true and accurate.

29. On August 16, 2012, while completing other job tasks, Ms. Chotas came upon a directory in the company's shared computer hard drive ("S: drive") labeled "Area_Postal." In that directory, she found various files related to Area's USPS business, including one called "Area_Financials." In that folder, she found the USPS "financials" submissions, initialed by David Demchak and dated 3/2/12. There was also a letter dated 3/2/12 addressed, "To Whom it May Concern" and forwarding Area's financial statements for 2009, 2010 and 2011 and certifying that they reflected an accurate overview of the company's financial strength.

30. Ms. Chotas examined the financial statements that had been submitted and saw that they contained false information, including the $500,000 of overstated revenue for the year ending December 31, 2011, that she had discovered and corrected

in March of 2012.  The proper amount of net income for the year ending December 31, 2011 should have been $686,955, but was instead falsely reported to the USPS as $1,186,955, a difference of $500,000.

31.     Ms. Chotas discovered that Defendants had also overstated the Assets, specifically the value and number of trucks in the fleet, by $500,000, thereby falsely inflating Area's "Supplier Capability" and "Financial Capability."   The proper amount for the cost of trucks as of December 31, 2011, should have been $4,682,151, but was instead falsely reported to the USPS as $5,182,151, a difference of $500,000.

32.     The net effect of all of these false items was to knowingly misrepresent the company's "Financial Capability" and "Supplier Capability," the main categories of evaluation used by the USPS, to induce the USPS to renew Area's contract.

33.     On August 21, 2012, Ms. Chotas confronted her immediate supervisor, Al Gremmel, who was Area's Operations Manager, informing him that there were "fraudulent entries" on the financial submissions to the USPS that would allow Area to obtain a three year contract renewal from the USPS.  She also informed him of her earlier findings of fraudulent journal entries and other suspicious postings in March and told him that she now believed that the documents and entries she had discovered had been illegally used to obtain the USPS contract renewals.

**Defendants Retaliate Against Ms. Chotas For Her Complaints of Fraud**

34. Almost immediately after Plaintiff discovered the fraudulent journal entries and confronted Lori Demchak in March 2012, she began to be minimized and marginalized in her job duties and responsibilities in direct retaliation for her complaints of fraud.

35. Beginning on March 16, 2012, Ms. Chotas's duties were slowly diminished. Lori Demchak no longer permitted her to audit the payroll, prevailing wages, health and welfare, or health insurance accounts and books. Lori Demchak also removed Ms. Chotas from her human resources duties. Ms. Chotas was instructed by Lori Demchak not to speak or submit information to the Certified Public Accountant, Tim Waggoner of Waggoner, Frutiger & Daub, LLP on Area's behalf. She no longer reported to Ms. Demchak, but was told that her supervisor would be Al Gremmel, the Operations Manager.

36. On March 22, 2012, Ms. Demchak required that Ms. Chotas stop tracking revenue, telling her, "it was a waste of time".

37. On March 30, 2012, when Ms. Chotas requested assistance from Ms. Demchak regarding a new contract requiring a Kentucky weight distance tax report, Ms. Demchak responded, "good luck with that" and walked away.

38. On April 13, 2012, Ms. Demchak requested that Ms. Chotas turn in her folders pertaining to active employee Family and Medical Leave Act files, active unemployment court hearing documents, for which she had appeared in court as part of her human resources duties, company health insurance and employees H.S.A. accounts to the payroll department.

39. On April 17, 2012, while Mr. Gremmel was training Ms. Chotas on Load Trek, a computer program designed to track drivers' hours and routes, Ms. Demchak arrived in the office and ordered that the training be halted.

40. Over a five month period beginning in April of 2012, Mr. Gremmel had attempted to increase Ms. Chotas's workload but could not secure approval from Ms. Demchak to do so.

41. On May 4, 2012, Ms. Chotas noticed that her computer folders pertaining to her research filed on policies and procedures, human resources research, and the company's financial trending data were all missing from her computer. Ms. Demchak responded that she had "bigger things to worry about" than Ms. Chotas's missing files.

42. On August 21, 2012, Ms. Chotas informed Al Gremmel of her findings from March and her most recent discoveries of the fraudulent documents. She also told him that she knew the increasing reduction in her duties was as a direct result of

her complaints of fraud. Ms. Chotas confided in Al Gremmel that she was concerned that her job was in jeopardy because of her actions. Mr. Gremmel agreed with all of her statements.

43. On August 22, 2012, Mr. Gremmel informed Plaintiff that he would discuss her findings and concerns with the Demchaks.

44. On August 23, 2012, Ms. Chotas arrived at work at approximately 6:55 a.m. and discovered that half of her work binders were missing and that invoices she was researching were gone.

45. On August 23, 2012, Ms. Chotas met with Mr. Gremmel at approximately 7:30 a.m. and was informed that he had spoken to the Demchaks about her concerns. Ms. Chotas asked Mr. Gremmel if David Demchak was aware of the fraudulent entries and the fraudulent reports submitted to the USPS on 3/2/2012 for Area's contract renewal. Mr. Gremmel stated that David Demchak was aware of all fraudulent activities. Mr. Gremmel also informed her that she had been denied the right to cash out vacation time, which was a standard policy of the company.

46. At approximately 11:30 a.m. on August 23, 2012, Ms. Chotas asked Mr. Gremmel if she could leave work at that time, and he granted her permission to do so.

47. On August 24, 2012, Ms. Chotas arrived at work at approximately 7:00 a.m. and discovered that all of her work binders were missing. At 11:30 a.m. she was

asked to meet with Mr. Gremmel and Ms. Demchak. Ms. Demchak stated she was unhappy that she had left early the previous day. Ms. Chotas explained that she did not have additional work to do, that she had worked sufficient hours to take the time off, and that she had the approval of Mr. Gremmel.

48. During this meeting, Ms. Demchak told Plaintiff she was not comfortable with her job performance, and therefore, the company had no work for her. However, Mr. Gremmel immediately offered her work, which Ms. Chotas accepted, but Ms. Demchak refused, stating that Plaintiff's employment was terminated.

49. Also during this meeting, Plaintiff asked if her reports of fraudulent activities had anything to do with her termination. In response, Mr. Gremmel nodded his head that it did. Ms. Demchak told Ms. Chotas that the company would not fight her request for unemployment compensation.

50. Plaintiff believed in good faith that Defendants had submitted false records to the USPS in order to win the award of a HCR contract. By complaining to her superiors and searching for additional information related to the fraud in an attempt to correct the false submissions, Ms. Chotas engaged in conduct designed to further an action under the False Claims Act. As a result, Plaintiff was discriminated against in the terms and conditions of her employment and fired because of her lawful attempts to stop and/or correct Defendants' fraudulent conduct.

15

51. By virtue of the acts described above, Defendants threatened, harassed, and/or otherwise discriminated against Ms. Chotas as a direct result of lawful acts done by her on her own behalf or on behalf of others in furtherance of an action under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

52. As a direct and legal result of the conduct of Defendants, Plaintiff has sustained and will suffer the loss of salary and other valuable employee benefits; and interest thereon.

53. As a direct and legal result of the conduct of Defendants, Plaintiff has sustained and will continue to sustain emotional distress and humiliation.

54. Plaintiff is entitled to all relief necessary to make her whole, including reinstatement with the same seniority to the position she held before her unlawful termination, two times accrued back pay that would have been earned by Plaintiff but for the retaliation against her by Defendants, accrued interest on such back pay, front pay, and special damages, including but not limited to mental anguish and suffering, humiliation, costs of litigation and attorneys' fees.

55. By virtue of the acts described above, Plaintiff suffered and continues to suffer loss of wages and benefits, together with loss of interest on the same, loss of seniority, mental anguish, suffering and humiliation, and has incurred liability for costs of litigation and attorneys' fees.

WHEREFORE, Plaintiff requests that judgment be entered in her favor against Defendants, ordering that:

    a.    Defendants pay an amount equal to two times back pay, plus interest, front pay and special damages pursuant to 31 U.S.C. § 3730 (h);

    b.    Defendants pay Plaintiff's costs of litigation and attorney's fees in prosecuting this action; and

    c.    Plaintiff recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | McCarthy Weisberg Cummings, P.C. |
| Date:  January 17, 2014 | /s/ Joel Weisberg<br>Joel Weisberg, Esquire<br>PA Bar I.D. #:  PA 12629<br>jweisberg@mwcfirm.com |
|  | Larry A. Weisberg, Esquire<br>PA Bar I.D. #: PA83410<br>lweisberg@mwcfirm.com |
|  | Derrek W. Cummings, Esquire<br>PA Bar I.D. #: PA83286<br>dcummings@mwcfirm.com<br>2041 Herr Street<br>Harrisburg, PA 17103-1624<br>(717) 238-5707<br>(717) 233-8133 (FAX)<br>*Attorneys for Plaintiff* |